**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

—————————————————————
)
E. MONTREZ NICHOLSON,                    )
)
              Plaintiff,              )
)
      v.                                  )        Civil Action No. 24-2894 (RBW)
)
MICHAEL RIGAS,[1] Acting Administrator,  )
General Services Administration,         )
)
              Defendant.              )
)
—————————————————————

**MEMORANDUM OPINION**

The plaintiff, E. Montrez Nicholson, brings this civil action against the defendant,

Michael Rigas, in his official capacity as the Acting Administrator of the General Services

Administration ("GSA"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. §§ 2000e–2000e-17. See Civil Complaint for Employment Discrimination ("Compl.")

¶ 1, ECF No. 1. Specifically, the plaintiff alleges that her supervisors at GSA (1) created a

hostile work environment based on her race; and (2) retaliated against her for engaging in

protected activity. See id. Currently pending before the Court is the Defendant's Motion to

Dismiss ("Def.'s Mot."), ECF No. 15, pursuant to Federal Rule of Civil Procedure 12(b)(6).

Upon careful consideration of the parties' submissions,[2] the Court concludes for the following

reasons that it must grant in part and deny in part the defendant's motion.

———————————————

[1] Michael Rigas, Acting Administrator of General Services, is automatically substituted for his predecessor, Robin Carnahan, pursuant to Federal Rule of Civil Procedure 25(d).

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the plaintiff's Praecipe/Notice of Filing of Civil Complaint Exhibit Nos. 1-5 ("Pl.'s Exs."), ECF No. 3; (2) the Defendant's Memorandum of Points and Authorities in Support of Motion to Dismiss ("Def.'s Mem."), ECF No. 15-1; (3) the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp'n"), ECF No. 17; and (4) the Reply in Further Support of Defendant's Motion to Dismiss ("Def.'s Reply"), ECF No. 19.

## I.    BACKGROUND

### A.    Factual Background

The following allegations are derived from the plaintiff's Complaint, unless otherwise specified.  The plaintiff identifies herself as an "African-American female" who was employed as a "Senior Procurement Analyst, GS-[1102-14], in [the GSA] M[ultiple] A[ward] S[chedules] Acquisition Support and Integration Division."  Compl. ¶¶ 4(1)[3], 22.  At the time she filed her Complaint in this case, the plaintiff "ha[d] been a federal employee for over thirty five [ ] years." Id.  Relevant here, between December 2010 and July 2022, the plaintiff served as a Senior Procurement Analyst within the GSA's Office of Acquisition Management ("QSA"), a subdivision of the Federal Acquisition Service's ("FAS") Office of General Supplies and Services.  See id.  The plaintiff represents that she received Level 5 performance ratings (the highest possible rating) from her supervisors for the Fiscal Years 2017 through 2020.  See id. ¶ 24.

### 1.  Lisa Ellis's Alleged Hostility Toward the Plaintiff

From August 2020 to December 2020, one of the plaintiff's supervisors, Mark L. Dunkum, "temporarily promoted [the p]laintiff to act as the Director of [the Supply Chain & Acquisition Division ('QSAC') of the QSA], which is a GS-15 supervisory position."  Id. ¶ 32. Throughout the plaintiff's temporary assignment, she supervised Lisa Ellis, see id., who is a white female, see id. ¶ 4.  "Consistent with [the p]laintiff's historical performance ratings, [Mr.] Dunkum rated [her] overall performance during that time as Level 5 'Outstanding.'"  Id. ¶ 32.

---

[3] The plaintiff's Complaint duplicates paragraphs 2–4, see Compl. at 2–3, and therefore the Court will distinguish between duplicated paragraphs by including (1) or (2) with a paragraph citation to indicate which of the two duplicated paragraphs in the Complaint is being cited.

In December 2020, Mr. Dunkum appointed Ms. Ellis to serve as acting Director of the QSAC, a position Ms. Ellis continued to occupy "until she was selected by [Mr.] Dunkum to permanently fill the position effective on or about July 18, 2021." Id. ¶ 33. As both acting Director and permanent Director of the QSAC, Ms. Ellis supervised the plaintiff, who she had initially replaced as acting Director. See id. ¶ 35. The plaintiff alleges that, while temporarily acting as director, Ms. Ellis began "to reflect animus towards [the p]laintiff and harass her." Id. ¶ 34. For example, the plaintiff alleges that, between January 2021 and July 2022, Ms. Ellis "implemented a scheme to systematically interrupt [the p]laintiff's work schedule and productivity by directing [her] to cancel scheduled meetings to attend meetings on behalf of [Ms.] Ellis[,]" id. ¶ 34, despite one of the plaintiff's white male peers being available to attend those meetings, see id. The plaintiff alleges that many of the meetings Ms. Ellis directed her to attend were not relevant to her role, incompatible with her work schedule, and/or unnecessary for her to attend in person due to a recording of the meeting being available. See id. The plaintiff further alleges that Ms. Ellis's actions hindered her upward progression at the GSA, including by disrupting her ability to attend required meetings to "maintain her status as a subject matter expert for" a particular program. Id.

In March 2021, as a result of her conflicts with Ms. Ellis, the plaintiff requested to meet with Mr. Dunkum. Id. ¶ 35. Although she initially met one-on-one with Mr. Dunkum to discuss her concerns, Mr. Dunkum invited Ms. Ellis to a follow-up meeting two days later, during which the plaintiff alleges that "[Ms. ]Ellis and [Mr.] Dunkum double-teamed [her]" and "excoriated [her] with meritless and false allegations." Id.

Later that same month, the plaintiff submitted a request to attend a virtual contract management training program, which according to the plaintiff, "[Ms. ]Ellis denied . . . within

fifteen [ ] minutes of [its] submission[,]" claiming that the "[p]laintiff had to cover for [Ms.] Ellis while [Ms.] Ellis was on vacation[.]"  Id. ¶ 36.  The plaintiff represents that, based on her knowledge of Ms. Ellis's position due to her previous temporary assignment in that same role, the virtual training would not have hindered her ability to cover Ms. Ellis's duties during her vacation.  See id.

Then, on June 3, 2021, while the plaintiff "was on approved sick leave for four [ ] hours[,]" Mr. Dunkum and Ms. Ellis allegedly sent her "a battery of emails requesting [that she perform] various and sundry tasks, knowing she was on approved leave."  Id. ¶ 37.  The plaintiff represents that "[w]hen [she] refused to work, [Mr.] Dunkum and [Ms.] Ellis falsely claimed that [she] was 'non-responsive.'"  Id.  Subsequently, on June 9, 2021, Mr. Dunkum sent the plaintiff two emails reprimanding her for her actions.  See id.

The plaintiff further alleges that Ms. Ellis's actions escalated after Ms. Ellis was permanently promoted to Director on July 18, 2021.  See id. ¶ 35.  On August 10, 2021, the plaintiff represents that she was informed that her mother was terminally ill and that her health was deteriorating rapidly, and consequently, she immediately traveled to South Carolina to be with her mother.  See id. ¶ 38.  Although the "[p]laintiff sought emergency annual leave, which according to the [GSA's] leave policy should be approved immediately by the supervisor[,]" Ms. Ellis allegedly "upbraided [the p]laintiff for not having the leave request approved prior to departing for South Carolina, and then significantly delayed approving [the p]laintiff's leave request . . . ."  Id.

Also on August 10, 2021, the plaintiff informed Robert Noonan, her third-level supervisor, as well as "his senior staff[ member], Taylor Wynings . . . , of the discriminatory, harassing action perpetrated against her by [Ms.] Ellis with [Mr.] Dunkum's approbation."  Id.

4

¶ 39.  In response, Mr. Wynings purportedly "directed [Ms.] Ellis to not confront [the p]laintiff while she was in South Carolina addressing her family emergency."  Id.  The plaintiff also alleges that "[b]ecause of [Ms.] Ellis's recalcitrance[ regarding her supervision of the plaintiff], . . . [Mr.] Wynings[,] with the approval of [Human Resources], drafted a document" setting forth expectations for Ms. Ellis's supervision of the plaintiff.  Id. ¶ 40.  According to the plaintiff, the document "instructed [Ms.] Ellis to cease and desist micromanaging and excessively scrutinizing [the p]laintiff and otherwise mistreating [her,]" id., and directed Ms. Ellis to meet with Vivian Carrasco, a representative of Employee Relations, prior to engaging with the plaintiff regarding her performance or Ms. Ellis's concerns with the plaintiff's leave requests, see id.  However, the plaintiff alleges that although Mr. Dunkum presented this document to Ms. Ellis in August 2021, Ms. Ellis failed to comply with the expectations regarding her management of the plaintiff and neither Mr. Dunkum nor Mr. Noonan, both of whom are white, see id. ¶ 30, took any further action, despite their alleged knowledge that Ms. Ellis failed to conform her actions to their directive, see id. ¶ 41.

Also in disregard of Mr. Wynings' directive, on October 4, 2021, Ms. Ellis again allegedly "demanded that [the p]laintiff work while she was on approved annual leave[,]" despite her knowledge that the plaintiff "was actually hospitalized in late September/early October 2021" for "renal kidney failure and other new medical conditions/diagnoses such as insomnia, anxiety, elevated cholesterol[,] and hypertension[,]" which the plaintiff contends were the result of the allegedly hostile work environment she had been subjected to.  Id. ¶ 42.  After the plaintiff complained to Mr. Dunkum, Mr. Dunkum allegeldy sent an email to the plaintiff and Ms. Ellis, telling the plaintiff "[i]f you are on leave, don't worry about what's due[,]" and informing Ms.

5

Ellis that he was "ok[ay] without the monthly report and [they could] talk about the [Fiscal Year 2022] metrics and figure something out" in the plaintiff's absence.  Id. ¶ 43.

**2. The Plaintiff's Equal Employment Opportunity ("EEO") Activity and Her Supervisors' Alleged Retaliation**

The plaintiff represents that on or about October 25, 2021, she "informed Vivian Carrasco of [her] intent to seek redress from the [GSA's] EEO office[,]" and that "[Ms. ]Carrasco reported [her] communication to [Ms.] Ellis, [Mr.] Dunkum[,] and [Mr.] Noonan." Id. ¶ 45 n.10.  The plaintiff alleges that, after she contacted the EEO office on November 1, 2021, Ms. Ellis, Mr. Dunkum, and Mr. Noonan retaliated against her.  See id. ¶ 45.

Specifically, the plaintiff alleges that, within three weeks of her contacting the EEO office, Ms. Ellis: (1) "removed [her] from major work-related programs and the Process Improvement Multiple Award Schedule Governance Sub-committee[,]" id. ¶ 46; (2) "questioned [her] about attending a Blacks in Government monthly meeting during her lunch hour in violation of [GSA] policy," id.; (3) "issued [her] a knowingly false or inaccurate [Fiscal Year 2021] Performance Appraisal . . . [,] which caused [the p]laintiff to receive a significantly reduced performance bonus and other benefits, and threatened [the p]laintiff with unwarranted disciplinary action when [she] refused to sign it[,]" id.; (4) "revoked [her] prior approval of and denied a detail assignment for [the p]laintiff," which had already been approved by the necessary GSA management, id.; (5) declined to select the plaintiff for a designee position, but "forced [the plaintiff] to perform [that same] work of the white male colleague who was selected by [Ms.] Ellis, [Mr.] Dunkum, and [Mr.] Noonan" for the role, id. ¶ 49; and (6) "directed [the p]laintiff to create and maintain a metrics tracker system, which was [Ms.] Ellis's job[,] and not [the p]laintiff's job[,]" id.

The plaintiff further alleges that, after she "filed her [f]ormal EEO [c]omplaint" on January 21, 2022, see id. ¶ 47 n.13, Ms. Ellis, Mr. Dunkum, and Mr. Noonan again retaliated against her, see id. ¶ 47. Namely, on February 2, 2022, Mr. Dunkum announced a restructuring of the QSAC, effective February 13, 2022, that would combine the QSAC with another division. See id. According to the plaintiff, these two divisions were severed in 2017 to create two GS-15 supervisory opportunities; however, upon the retirement of one of the incumbent GS-15 supervisors, the restructuring downgraded the retiring individual's position to a GS-14 position, thus "eliminat[ing] a promotional opportunity for [the p]laintiff . . . ." See id. Further, the plaintiff alleges that, at the time of the restructuring, Ms. Ellis, Mr. Dunkum, and Mr. Noonan knew that the plaintiff wished to be promoted and "would apply for the upcoming vacant GS-15 position, if the same were openly competed." Id. The plaintiff contends that this reconsolidation conflicted with recommendations by "[Mr. ]Wynings, [Human Resources], and a study performed by FAS' Workforce Transformation division" and was implemented for the sole purpose of "eliminat[ing] a promotional opportunity for [the p]laintiff, who was exceptionally well-qualified for" the position. Id. As a result of these additional actions, the plaintiff subsequently amended her EEO complaint on February 14, 2022, and again on July 1, 2022. See id. ¶¶ 8, 10.

As the plaintiff pursued her EEO complaint, she alleges that Ms. Ellis issued her two additional "false and inaccurate" performance reviews—a Level 3 informal rating on her mid-year performance review on May 22, 2022, and a Level 4 rating on her Fiscal Year 2022 performance review on November 10, 2022. See id. ¶ 48. Separately, the plaintiff alleges that on May 26, 2022, "[Mr. ]Dunkum informed [her] that he and [Ms.] Ellis would [both] serve as her first-line supervisors, which is contrary to [GSA] personnel policy and abjectly

7

oppressive[.]" Id. The plaintiff further amended her EEO complaint on November 14, 2022, in response to Ms. Ellis's November 2022 performance review rating. See id. ¶ 12.

After the plaintiff was detailed to the United States Office of Management and Budget ("OMB") between July 2022 and October 2023, she returned to the GSA "outside of [Ms.] Ellis or [Mr.] Dunkum's line of supervision." Id. ¶ 22. And, during her detail to the OMB, the plaintiff represents that she received a Level 5 performance evaluation from her supervisor. See id. ¶ 24. Finally, in 2024, the plaintiff represents that she was promoted to a GS-15 position within the GSA. See id. ¶ 22.

**B.      Procedural Background**

The plaintiff filed her Complaint in this case on October 11, 2024. See Compl. at 1. On January 29, 2025, the defendant filed his motion to dismiss. See Def.'s Mot. at 1. On February 19, 2025, the plaintiff filed her opposition to the defendant's motion to dismiss, see Pl.'s Opp'n at 1, and on February 26, 2025, the defendant filed his reply in support of his motion, see Def.'s Reply at 1.

## II.      STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint has properly "state[d] a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Also, the Court need not "accept legal conclusions cast as factual allegations[,]" or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint[.]" Hettinga, 677 F.3d at 476. The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.    ANALYSIS

The defendant argues that the plaintiff's Complaint must be dismissed because (1) the plaintiff's hostile work environment claim "does not allege a severe and pervasive pattern of ridicule and insult[,]" Def.'s Mem. at 6; and (2) the plaintiff's retaliation claim "fails to allege facts making it plausible that retaliation occurred[,]" id. The plaintiff responds that she has adequately stated both hostile work environment and retaliation claims, and thus "[t]he Complaint provided 'factual heft' to show a plausible entitlement to relief under Title VII." Pl.'s Opp'n at 23. The court will address each of the defendant's arguments and the plaintiff's responses in turn.

9

**A.      Whether the Plaintiff Has Stated a Hostile Work Environment Claim Under Title VII**

The defendant argues that the plaintiff's "race-based hostile work environment claim fails because [the p]laintiff does not allege a severe and pervasive pattern of ridicule and insult; rather, she complains of work-related grievances." Def.'s Mem. at 6.  In response, the plaintiff argues that she has adequately established a hostile work environment claim because she has shown that: (1) "[t]he harassment was pervasive because [she] was subjected to an act of harassment nearly every month for nearly two [ ] years[,]" Pl.'s Opp'n at 25; and (2) "[t]he harassment was severe because the abusive workplace caused [the p]laintiff to be hospitalized," id.

Title VII of the Civil Rights Act of 1964 states that "[i]t shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).  Title VII's protections extend to prohibiting employers from "requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)).  "To prevail on [a hostile work environment] claim, a plaintiff must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Baloch v. Kempthorne, 550 F.3d 1991, 1201 (D.C. Cir. 2008) (quoting Harris, 510 U.S. at 21).  "Courts look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Morgan, 536 U.S. at 116 (quoting Harris, 510 U.S. at 23). The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position." Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998).

A claim based on "several individual acts" may "become actionable due to their 'cumulative effect,'" if they are "'adequately linked' such that they form 'a coherent hostile environment claim.'" Baird v. Gotbaum, 792 F.3d 166, 168–69 (D.C. Cir. 2015) (quoting Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011)). Courts consider the frequency of individual acts and whether they involve the same managers and the same kind of employment action to determine whether individual acts are adequately linked. Shanks v. Int'l Union of Bricklayers & Allied Craftworkers, 134 F.4th 585, 597–98 (D.C. Cir. 2025). "Although a plaintiff need not plead a prima facie case of hostile work environment in the complaint, the 'alleged facts must support such a claim.'" McKeithan v. Boarman, 803 F. Supp. 2d 63, 69 (D.D.C. 2011) (quoting Middlebrooks v. Godwin Corp., 722 F. Supp. 2d 82, 90–91 & n.6 (D.D.C. 2010)).

However, Title VII is not a "general civility code for the American workplace." Oncale, 523 U.S. at 80. Thus, "[c]ourts in this jurisdiction have routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." Na'im v. Clinton, 626 F. Supp. 2d 63, 73 (D.D.C. 2009) (collecting cases); see Kelley v. Billington, 370 F. Supp. 2d 151, 157 (D.D.C. 2005) ("Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status.").

Here, as an initial matter, the plaintiff at times appears to argue that she has adequately established that she was the victim of discrimination due to individual actions taken by Ms. Ellis against her.  See Pl.'s Opp'n at 29–32 (arguing that the plaintiff has established actionable claims arising out of individual acts and those actions taken together).  However, the plaintiff did not actually plead a distinct discrimination claim, independent of her hostile work environment claim, and thus the plaintiff's reliance on legal authority regarding discrimination claims is misplaced.  Thus, the Court can only consider her claims under the hostile work environment framework.

Applying that framework, the Court concludes that the plaintiff has failed to adequately establish a hostile work environment claim based on her race because she has failed to show "some linkage between the hostile behavior" and her race.  Na'im, 626 F. Supp. 2d at 73. Although the plaintiff claims that her supervisors' conduct was based on race because they are of a different race than the plaintiff, the Complaint is devoid of any allegations that any of her supervisors commented on or otherwise ever referred to her race.  Indeed, the plaintiff alleges only one instance in which she was "questioned . . . about attending a Blacks in Government monthly meeting during her lunch hour in violation of Agency policy[.]"  Compl. ¶ 46. However, the plaintiff alleges this inquiry related to her attending the meeting during her lunch hour, not that Ms. Ellis's inquiry resulted from the nature of the meeting itself.  Thus, without more, this single, indirect association with the plaintiff's race precludes the Court from inferring that "the hostile work environment was the result of discrimination based on [the plaintiff's]

12

protected status." Kelley, 370 F. Supp. 2d at 157.[4]  Accordingly, the Court must dismiss the plaintiff's hostile work environment claim.

**B.      Whether the Plaintiff Has Stated a Claim for Retaliation Under Title VII**

Next, the Court addresses the plaintiff's Title VII retaliation claim.  The defendant contends that the "retaliation claim fails because the Complaint fails to allege facts making it plausible that retaliation occurred [and] . . . many of the alleged retaliatory incidents do not rise to the level of materially adverse actions."  Def.'s Mem. at 6.  In response, the plaintiff argues that her "Complaint chronicles [her] EEO activity . . . to which materially adverse action, or retaliation, or harassment immediately followed."  Pl.'s Opp'n at 19.

Under Title VII's anti-retaliation provision, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge."  42 U.S.C. § 2000e-3(a).  The anti-retaliation provision seeks to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms[,]" Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997)), and "protects an individual not from all retaliation, but from retaliation that produce[d] an injury or harm[,]" id. at 67.

To establish a claim for retaliation under Title VII, a plaintiff must "plausibly allege that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action by

---

[4] Even assuming the Court could infer a sufficient link to the plaintiff's race, the plaintiff's hostile work environment claim would fail because courts in this Circuit have consistently concluded that "work-related action by supervisors," such as unfair performance evaluations, imposing supervisory requirements, being required to work on days off, and restrictions on attending meetings, are insufficient to state a hostile work environment claim, even if tied to a protected characteristic.  See Harris v. Mayorkas, No. 21-cv-1083 (GMH), 2022 WL 3452316, at *16 (D.D.C. Aug. 18, 2022) (listing cases).  Although the plaintiff argues that her hospitalization establishes that Ms. Ellis's harassment was severe, see Pl.'s Opp'n at 25, the Supreme Court has held that the "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position[,]" Oncale, 523 U.S. at 81, not based on the subjective effect the alleged harassment had on the plaintiff.

[her] employer, and (3) the two are causally connected." Spence v. U.S. Dep't of Veterans Affs., 109 F.4th 531, 539 (D.C. Cir. 2024), cert. denied, 145 S. Ct. 594 (2024) (internal quotation marks omitted) (alteration in original).  The Court will address these three elements in turn.

### 1.  Whether the Plaintiff Engaged in Protected Activity

To engage in a protected activity, the plaintiff must show that she opposed "a practice that [she] reasonably and in good faith believed was unlawful under [Title VII]." McGrath v. Clinton, 666 F.3d 1377, 1380 (D.C. Cir. 2012) (emphasis omitted).  "It is well settled that Title VII protects informal, as well as formal, complaints of discrimination." Richardson v. Gutierrez, 477 F. Supp. 2d 22, 27 (D.D.C. 2007); see Mansfield v. Billington, 432 F. Supp. 2d 64, 73 n.3 (D.D.C. 2006) ("Because Title VII protects informal complaints such as letters, the plaintiff has stated a claim for retaliation under Title VII."); Bell v. Gonzales, 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination.").  However, "[w]hile no 'magic words' are required, the complaint must in some way allege unlawful discrimination [based on race, color, religion, sex, or national origin.]" Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006).

Here, the Court concludes that the plaintiff engaged in protected activity when she: (1) "made EEO contact with the Agency's EEO counselor" on November 1, 2021, Compl. ¶ 3; (2) filed her Formal Complaint of Discrimination on January 21, 2022, id. ¶ 6; (3) amended her Formal Complaint on February 14, 2022, see id. ¶ 8; (4) amended her Formal Complaint again

14

on July 1, 2022, see id. ¶ 10; and (5) amended her Formal Complaint yet again on November 14, 2022, see id. ¶ 12.[5]

### 2. Whether the Plaintiff Has Alleged a Materially Adverse Employment Action

In regards to the second element of the plaintiff's retaliation claim, the defendant appears to concede that, at this stage of the litigation, the plaintiff has adequately established the following materially adverse employment actions: (1) her performance review rating on November 15, 2021; (2) the denial of her detail on November 15, 2021; (3) her performance review rating on May 22, 2022; and (4) her performance review rating on November 10, 2022. See Def.'s Mem. at 18.  However, the defendant argues that the plaintiff's remaining allegations do not rise to the level of adversity required to support her retaliation claim including: (1) her removal from "major work-related programs[,]" Compl. ¶ 46; (2) being "micromanaged and directed to updated [her] work calendar," id. ¶ 7; (3) being questioned about the Blacks in Government Meeting, see id. ¶ 49; (4) being threatened with "unwarranted disciplinary action" when she refused to sign the November 15, 2021, performance appraisal, id. ¶ 46; (5) being directed to develop and implement a particular program, id. ¶ 7; (6) being "denied appointment" as the point of contact for the program she implemented in favor of a "white male colleague" who received the appointment, id. ¶ 49; (7) being directed to "create and maintain a metrics tracker[,]" id.; (8) the performance of her EEO counselor, see id. ¶ 8; (9) the preparation of the EEO counselor's report, see id.; (10) the restructuring of the plaintiff's division, see id. ¶ 47; (11)

---

[5] Although the defendant argues that the Court should not rely on the exhibits referenced in the plaintiff's opposition regarding some of these events because while they are referenced in the Complaint, they were not actually attached to the Complaint as exhibits.  See Def.'s Reply at 12.  However, for the purposes of determining whether the plaintiff engaged in protected activity at this stage of the litigation, the Court will rely on the plaintiff's representations in the Complaint itself, which suffice.

the assignment of two first-level supervisors to the plaintiff, see id. ¶ 48; and (12) the two-month delay in receiving an updated performance plan for the Fiscal Year 2023, see id. ¶ 15.

In response, the plaintiff argues that she has adequately established that several of these acts were materially adverse.  However, the plaintiff failed to respond to the defendant's arguments that the following allegations must be dismissed because they failed to constitute a materially adverse action: (1) that she was "micromanaged and directed to update her work calendar," id. ¶ 7; (2) that she was "threatened with disciplinary action for refusing to sign" an annual performance appraisal where no disciplinary action occurred, id.; (3) that she was "directed to develop and implement a [particular] program," id.; (4) the "manner in which the EEO counselor performed the EEO counseling and related activities," id. ¶ 8; (5) the "manner in which the EEO counselor prepared, and the substance of, the EEO Counselor's Report," id.; and (6) her supervisor's two-month delay in providing an updated performance plan to the plaintiff, see id. ¶ 15.  Therefore, the Court considers the plaintiff to have conceded that those actions were not materially adverse.  See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 238 F. Supp. 2d 174, 179 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").  Thus, the only remaining allegations for the Court to address are (1) her removal from "major work-related programs[,]" Compl. ¶ 46; (2); being questioned about the Blacks in Government Meeting, see id. ¶ 49; (3) being "denied appointment" as the point of contact for the program she implemented in favor of a "white male colleague" who received the appointment, id.; (4) being directed to "create and maintain a metrics tracker[,]" id.; (5) the restructuring of the plaintiff's division, see id. ¶ 47; and (6) the assignment of two first-level supervisors to the plaintiff, see id. ¶ 48.

16

"Unlike discriminatory actions, retaliatory actions need not be employment-related . . . , nor must they result in 'a materially adverse change in the terms or conditions of one's employment.'" Nurriddin v. Bolden, 40 F. Supp. 3d 104, 116 (D.D.C. 2014), aff'd, 818 F.3d 751 (D.C. Cir. 2016).  The key question, in the retaliation context, is whether a given action is "harmful to the point that [the employer's action] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Harris v. Mayorkas, No. 21-cv-1083 (GMH), 2022 WL 3452316, at *11 (D.D.C. Aug. 18, 2022) (alteration in original) (quoting Burlington N. & Santa Fe Ry., 548 U.S. at 57).  Thus, to support a retaliation claim, the employer's actions must "cause[] material adversity, not trivial harms[.]"  Id. (quoting Wiley v. Glassman, 511 F.3d 151, 161 (D.C. Cir. 2007)).  "'[P]urely subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions."  Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006) (quoting Forkkio v. Powell, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002)).  Additionally, harms that are too speculative do not constitute materially adverse actions.  See Bridgeforth v. Jewell, 721 F.3d 661, 664, (D.C. Cir. 2013).

Here, the Court concludes that neither the plaintiff's alleged removal "from major work-related programs[,]" Compl. ¶ 46, nor the alleged denial of "the opportunity to be the agency designee" of a program she was "directed to develop and implement[,]" id. ¶ 7, are sufficiently adverse to support the plaintiff's retaliation claim.  Courts in this Circuit have generally concluded that "the denial of training opportunities and committee assignments outside of, or in addition to, an employee's job responsibilities does not generally constitute an adverse employment action."  Warner v. Vance-Cooks, 956 F. Supp. 2d 129, 171 (D.D.C. 2013).  And, although a plaintiff may still show that the denial of assignments carried with it some material adversity, the plaintiff has not alleged that these actions caused her any harm, such as by

17

affecting her salary, her employment status, or her opportunities for advancement.  Cf. Williams

v. Family Health Int'l, No. 24-cv-2654 (BAH). 2025 WL 2506580, at *15 (D.D.C. Sept. 2, 2025)

(concluding that removal from a steering committee was not a materially adverse action where

the plaintiff had failed to "explain how that impacted her work in business development or

affected her opportunities for advancement").

Likewise, the plaintiff has failed to establish that her allegations that she was questioned

"about attending a Blacks in Government monthly meeting during her lunch hour[,]" Compl.

¶ 49; "instructed to create and maintain a metrics tracker[,]" id., and assigned two "first-line

supervisors[,]" id. ¶ 11, are sufficiently harmful to rise to the level of materially adverse actions.

That is because "[i]ncreased scrutiny at work does not qualify as a materially adverse action

unless it 'is so extreme and intrusive as to constitute harassment in its own right.'"  Caison v.

Tulino, No. 23-cv-2414 (LLA), 2025 WL 947470, at *6 (D.D.C. Mar. 28, 2025) (quoting

Aldrich v. Burwell, 197 F. Supp. 3d 124, 134 (D.D.C. 2016)).  Although the plaintiff contends

that she was essentially micromanaged, she has not alleged that these instances of heightened

scrutiny, such as being questioned about attending a meeting or assigned two supervisors, were

"extreme" or "intrusive" or that they resulted in some other material harm.  Aldrich, 197 F. Supp.

3d at 134.  Nor does the plaintiff establish how being made to occasionally complete arguably

trivial assignments associated with increased supervisory monitoring, such as maintaining a

metrics tracker, is "harmful to the point that [the employer's action] could well dissuade a

reasonable worker from making or supporting a charge of discrimination."  Harris, 2022 WL

3452316, at *11 (alteration in original) (quoting Burlington N. & Santa Fe Ry., 548 U.S. at 57).

Therefore, although the plaintiff argues that her white male colleagues were not subjected to

micromanagement, her allegations in this regard, without more, preclude the Court from concluding that these actions constituted materially adverse actions.

However, the Court concludes that at this stage of the litigation, the plaintiff has adequately established that the restructuring of her division, which she alleges "had the intended material effect of elimination [of] a GS-15 position and promotional opportunity for which the [plaintiff] was poised and exceptionally well qualified[,]" Compl. ¶ 8, constitutes a materially adverse action. Although the District of Columbia Circuit has held that a plaintiff cannot rely on alleged harm that is "unduly speculative" to establish a materially adverse action, Bridgeforth, 721 F.3d at 663, the plaintiff has established a reasonable inference that the restructuring impeded her opportunity for promotion because she has alleged that at the time of the restructuring, there was an upcoming vacant GS-15 position, her supervisors knew that she would apply for that position, and the restructuring of the division eliminated that upcoming vacancy. That, at this stage, is enough to establish a materially adverse action because she had established that she was "denied a tangible opportunity to advance her career." Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir. 2009); see Cones v. Shalala, 199 F.3d 512, 521 (D.C. Cir. 2000) (holding that the defendant employer's refusal to allow the plaintiff employee to compete for promotion constituted a materially adverse action).

In sum, the Court concludes that the plaintiff has either conceded or failed to establish materially adverse employment actions regarding the disputed allegations in her retaliation claim, with the exception of her restructuring allegation. Thus, the Court must dismiss these components of her retaliation claim and will proceed to determine whether she has established the third and final element of her retaliation claim based on her restructuring allegation and the other actions the defendant has conceded were materially adverse.

19

**3. Whether the Plaintiff Has Established a Causal Connection Between Her Protected Activity and the Alleged Materially Adverse Employment Actions**

Finally, the Court considers whether the plaintiff has asserted the required causal link between the alleged adverse actions and her prior protected activity. The defendant argues that the plaintiff has failed to establish that her protected activity and the allegedly retaliatory acts were sufficiently close in time to raise the inference of retaliation. See Def.'s Mem. at 15. In response, the plaintiff argues that she has adequately established that each of the materially adverse actions occurred within forty days of her various instances of protected activity, and thus, the defendant's challenge must be rejected. See Pl.'s Opp'n at 38–39.

To adequately allege a causal link, the "employee's protected activity must be the impetus for the employer's adverse and allegedly retaliatory employment action, and the action cannot have already been contemplated by the employer before it learned of the protected activity." Salak v. Pruitt, 277 F. Supp. 3d 11, 22 (D.D.C. 2017) (internal quotation marks and citation omitted). "In other words, 'retaliation claims must be proved according to traditional principles of but-for causation.'" Toomer v. Carter, No. 11-cv-2216 (EGS/GHM), 2016 WL 9344023, at *22 (D.D.C. Mar. 24, 2016) (quoting Farzam v. Shell, No. 12-cv-35 (RMC), 2015 WL 8664184, at *4 (D.D.C. Dec. 11, 2015)). "However, but-for causation does not mean that retaliation must be the only cause of the employer's action—merely that the adverse action would not have occurred absent the retaliatory motive." Farzam, 2015 WL 8664184, at *22.

"In the absence of direct evidence of retaliatory intent, a causal relationship between protected activity and adverse actions by an employer may be inferred through either temporal proximity or the existence of a pattern of antagonism." Román v. Castro, 149 F. Supp. 3d 157, 169 (D.D.C. 2016) (citing Taylor, 571 F.3d at 1322–23). However, a plaintiff relying solely on temporal proximity must adequately establish that the relationship is "close." Ho v. Garland,

20

106 F.4th 47, 52 (D.C. Cir. 2024).  Although there is no bright-line rule determining how proximate in time the protected activity and adverse actions must be, the D.C. Circuit has repeatedly indicated that "in some instances a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation."  Id. (quoting Hamilton v. Geithner, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012)).[6]

Here, the Court concludes that the plaintiff has adequately established a causal connection between her protected activity and the materially adverse actions in her Complaint that have otherwise survived dismissal.  The plaintiff engaged in protected activity on November 1, 2021, by contacting the EEO office, see Compl. ¶ 3, and fourteen days thereafter, on November 15, 2021, she received her first negative performance review and was denied a detail, see id. ¶ 46.  Similarly, the plaintiff engaged in protected activity on January 21, 2022, by filing her Formal Complaint of Discrimination, see id. ¶ 6, and twelve days later, on February 2, 2022, her supervisors announced the restructuring of her division, which allegedly deprived the plaintiff of a promotional opportunity, see id. ¶ 47.  These events occurring within two weeks of protected activity are certainly "close" enough in time to establish a causal link.  Ho, 106 F.4th at 52.

Regarding the plaintiff's receipt of allegedly retaliatory performance reviews on May 22, 2022, and November 10, 2022, these adverse actions occurred more than three months after her protected activity, which—standing alone—would be too stale to infer a causal link between these events.  See id.  However, the plaintiff does not rely solely on temporal proximity, and,

---

[6] Although the D.C. Circuit had previously set a lower bar for pleading the causal relationship element of a retaliation claim under Title VII at the motion to dismiss stage, under which the plaintiff needed only allege that "the [defendant] retaliated against [her] because [she] engaged in protected activity[,]" Rochon v. Gonzales, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (cleaned up), the D.C. Circuit has recently held that this pleading standard "is no longer binding authority[,]" Ho, 106 F.4th at 51 n.2 (citation omitted).

accepting the allegations in her Complaint as true, the Court concludes that she has adequately established the "existence of a pattern of antagonism[,]" Román, 149 F. Supp. 3d at 169, that included these performance reviews. Specifically, the plaintiff alleges that the May 2022 performance review was an informal mid-year performance review, issued following other acts of antagonism between the plaintiff and Ms. Ellis, see Compl. ¶ 48, and that she only received her formal, annual performance review in November 2022, after the conclusion of that fiscal year, see id. Moreover, the plaintiff has further alleged that these two performance reviews are in stark contrast to her receipt of the highest possible performance ratings she received from other supervisors in the years before and after her work under the supervision of Ms. Ellis. See id. ¶ 24. Thus, at this stage of the case, the Court concludes that the plaintiff has adequately established a causal link between her protected activity and her receipt of these performance reviews.

Thus, the Court concludes that the plaintiff has adequately established a retaliation claim based on: (1) her November 15, 2021, performance review; (2) the denial of her detail on November 15, 2021; (3) the February 2, 2022, restructuring of her division; (4) her May 22, 2022, performance review; and (5) her November 10, 2022, performance review. Accordingly, the Court must grant in part and deny in part the defendant's motion to dismiss the plaintiff's retaliation claim.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part the defendant's motion to dismiss.

22

**SO ORDERED** this 11th day of March, 2026.[7]

REGGIE B. WALTON
United States District Judge

---

[7] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.